LANDES *et al. vs.* GLOBE PLANTER MANUFACTURING COM-
PANY *et al.*

1.  Where the only verification of a bill for injunction was an affidavit of one of counsel, to the effect that what he knew of his own knowledge was true, and what he had heard he believed to be true, but it was not stated that he knew any fact of his own knowledge, such verification was not sufficient; and where the answer did not admit or verify the material facts alleged in the bill, and there were no depositions, an injunction was properly refused.

2.  Complainants in equity must do equity, and must come in with clean hands.   Therefore, where a corporation was unable to pay its indebtedness, and made an arrangement with the indorser on its notes whereby he was to assume the payment of its debt on certain terms agreed upon, and the indorser thereupon took charge of the property under the agreement, and discharged the debt by an arrangement with the creditor to look to him individually for its payment, and all the stockholders acquiesced except one, who had not paid for her stock, and whose excuse therefor was not verified, equity will not enjoin the consummation of the agreement at her instance.   She should pay up before equity will grant relief; especially by enjoining the payment of a just debt to an innocent third party and stopping the only way to pay it, except by sheriff's sale, after expensive litigation.

3.  The stockholders empowered the directors to make the arrangement which was made in this case, with Thomson or anyone else; nor did the action of the stockholders confine the directors to one mode of arranging for the debt, but was broad enough to cover that which was made.

October 2, 1884.

Equity. Practice in Superior Court. Debtor and Cred-
itor. Corporations. Stockholders. Injunction. Con-
tracts. Before Judge HAMMOND. Fulton County. At
Chambers. August 4, 1884.

S. J. Landes and his wife, Mrs. L. W. Landes, filed their
bill on behalf of themselves and of all other persons who
might come in and be made parties, against the Globe
Planter Manufacturing Company and William S. Thom-
son, alleging, in brief, as follows: The Globe Planter
Manufacturing Company was chartered by the superior
court of Fulton county, on June 24, 1882, and organized
on August 26, with a capital stock of $50,000.00, divided
into shares of $100.00 each, with the privilege of increas-
ing the capital to $100,000.00, and adopted certain by-laws,
among which were the following:

Article II. Section 3. "The board of directors shall have power to
elect the officers of the company, fill vacancies in the board and, in
the absence of the president or his inability to act, may appoint a
president *pro tempore,* upon whom shall devolve all the duties of the
president. They shall have general control and management of the
property and directions of the affairs of the company, subject only to
the special instructions of the stockholders by vote at a regular meet-
ing. . . . "

Article VI. Section 1. "The company shall not be responsible for
or on account of any contract or agreement whatever, unless the same
has been entered into by the president or other authorized agent, in
accordance with the by-laws and direction of the board of directors."

Article VIII. Section 1. "The foregoing by-laws may be altered,
amended or repealed at any regular meeting of the board of directors,
or a meeting called for that purpose."

On August 26, 1883, the by-laws were amended so as to
authorize the election of a vice-president, and William S.
Thomson, who had theretofore been the treasurer, was
elected vice-president, and shortly thereafter began to dis-
charge the duties of the president, in the absence of that
officer, and also continued to discharge the duties of treas-
urer up to January 1, 1884. On August 26, 1883, the
capital stock was increased to $80,000.00. At the date of

v 73-13

organization, Thomson owned only nine shares, but in June, 1884, he had become the owner of three hundred and fifty-three shares, and two of his relations owned twenty-four shares.    Before and during the administration of Thomson as vice-president and acting president, the company became largely indebted and financially embarrassed; and on ——— 1884, he executed, in the name of the company, notes to the amount of $17,500.00, which he endorsed individually, and negotiated at the Gate City National Bank; and this indebtedness, or a part of it, is still due and unpaid.    While acting as vice-president and treasurer, Thomson purposely so conducted and mismanaged the affairs of the company as to deplete its business, destroy its credit and wreck its fortune, so that its stock should be considered worthless, and so that he should get possession of the entire property and assets.    With this end in view, he caused a meeting to be called for June 17, 1884.    Of the eight hundred shares authorized to be issued, about seven hundred and eighty-five had been issued, and five hundred and twenty-five were represented at the meeting, three hundred and seventy-three of which were voted by Thomson. At that meeting the following motion was made and carried :

"Whereas, we have, in convention assembled, carefully investigated the condition and prospects of this company, and heard various plans for relief; and whereas, negotiations have been opened with Thomas Mickle & Company, of Louisville, Kentucky, for the manufacture of the planter on royalty; and whereas, such negotiations and terms already proposed by said Mickle & Company are satisfactory to us as stockholders :

"Therefore resolved, that the whole matter be referred to the board of directors, with full power to make such contracts and such disposition of the property of the company as will, in their judgment, secure the interests of the company."

The board of directors did nothing under the authority vested in them by this resolution; but on July 7, 1884, a meeting of the directors was held, and the following communication was presented :

"*To the Board of Directors of the Globe Planter Manufacturing Co.:*

GENTLEMEN :—It seems to be impossible to make any arrangement by which the indebtedness of the company will be met on the 15th inst., when it falls due; and inasmuch as I am the endorser for the company to the extent of seventeen thousand dollars of its indebtedness, and wish to protect myself against loss on my said endorsement, I make the following propositions : If you will convey, transfer, assign and set over to me absolutely all the property and effects of the company, both real and personal, including notes, accounts and patent, I will surrender and cancel two hundred shares of my stock, and will assume and pay all the indebtedness of the company, and will further agree that, in the event I dispose of the property, I will, after paying all the indebtedness and retaining the real estate or the proceeds thereof, divide the excess *pro rata* amongst the stockholders ; or, if I continue the manufacture of the planter, I will pay the company, for *pro rata* distribution amongst the stockholders, one-half the net profits arising from the manufacture of the planter, after paying off the present indebtedness, as long as I manufacture under the patents you have, provided I, at my pleasure, shall have the right to do business under the company's charter. This July 7th, 1884.                 Respectfully,                 W. S. THOMSON."

The minutes show that the following occurred in this connection :

"After making the propositions, Mr. Thomson asked to retire; also N. T. Thomson. After discussing the matter, N. T. Thomson was recalled. Mr. Kimball moved that the resolution, authorizing the making of a trust deed to the Gate City National Bank, be rescinded, to secure the indebtedness of the bank. Passed.

"Mr. Kirkpatrick moved the acceptance of the proposition by W. S. Thomson be accepted; seconded by Mr. Kimball and passed."

Under this resolution, three conveyances were made by the company to Thomson, covering respectively the real estate, the personal property and the patent for the planter, the assets being of the value of $85,475.85. Thomson has not discharged the indebtedness of the company, and has not cancelled or surrendered the two hundred shares of stock.

It was charged that these acts were *ultra vires* and fraudulent.

Further, S. J. Lander, for his wife, subscribed for forty shares of stock, and paid on the purchase price thereof,

in cash and services, $2,621.45. He caused to be issued to his wife twenty-five shares, which she still has. He contracted with the company to act as traveling salesman for it at a monthly salary and hisexpenses. It was agreed that the salary should go towards paying the unpaid balance of his wife's subscription. He traveled for three and one-half months, and the amount for such time ($583 33) was credited on the stock account of Mrs. Landes. The company first changed, and finally violated, the contract with him, thus damaging him to the extent of $2,000.00, and but for this, the stock subscription of Mrs. Landes could have been paid off.

The prayer was for a cancellation of the conveyance to Thomson; that an accounting with him be had; for injunction and receiver, and for subpœna.

The answer of the company admitted its organization, as charged, but denied every allegation of fraud or improper conduct on the part of the defendants, or either of them, in express terms, and set up the facts in regard to the company and its business, showing that its indebtedness, for which Thomson was endorser, was about $17,000.00, and alleging that he had not only acted in the utmost good faith, and had, in no sense, mismanaged the affairs of the company, but had ever acted for the interest of the other stockholders to an extent that surprised those familiar with his efforts made in sustaining the credit of the company, which was kept at a high standard by the efforts and personal risks made by him.

It expressly denied the allegation that no action was taken under the resolution passed at the stockholders' meeting of June 17; asserted positively that said resolution was intended to authorize the board of directors to take any action they might deem advisable, and affirms that the action taken by the board on the 7th of July was not only in accordance with said resolution, but was for the best interest of the stockholders. The answer also denied any breach of the contract with S. J. Landes on the part of the

company, and stated that said Landes voluntarily abandoned the service of the company, and received not only full contract pay, but more than his services entitled him to ; and that all the stock subscriptions had been paid, except that of Mrs. Landes.

The answer of W. S. Thomson adopted the answer of the company, and denied that he ever did any act, or ever had any purpose, looking to getting possession of the effects of said corporation, until he had exhausted every effort to effect a sale, or make a contract that would give relief to the company. It affirmed that, in making the proposition accepted by the directors, on said 7th of July, he was actuated by a desire to protect himself, as endorser, and to do all in his power for the other stockholders, and denied, in terms, that he ever, at any time, did any act with a view to having the stock considered worthless, so that he could get the control and possession of the property and assets of the corporation. The answer alleged the indebtedness paid off by him at that time to be $3,047.52, and the existing indebtedness, outside of taxes, to be $15,000, and tendered complainants his bargain, if the latter would relieve him of it. It denied that he controlled or mismanaged the business, or that he ever, directly or indirectly, received one dollar's benefit from his connection with the company, but affirmed, on the contrary, that he was a heavy loser. The answer also showed that the property purchased by him from the company would have been exhausted in the payment of the indebtedness of the company, handled under legal process, it being salable only in the regular course of business.

The affidavit of *John F. Henry*, used on the hearing, shows that he was a stockholder, owning 243 shares of the capital stock of the company ; that he was not present or represented at the stockholders' meeting of June 17, but was notified of it, knew and approved of what was done, knew and approved of the subsequent action of the board of directors, and that the contract with Thomson was for

the best interest of the stockholders. The affidavit also discloses a full knowledge of Thomson's connection with the company, and declares deponent's approval of his conduct.

The affidavit of *L. J. Hill*, president of the Gate City National Bank, states the *bona fides* of all Thomson's transactions with the bank in connection with the company's affairs, and also that the indebtedness to said bank was a legitimate indebtedness of the company, which Thomson offered to secure by a transfer of the property conveyed to him.

The chancellor refused the injunction, and complainants excepted.

SPENCER & WAY; HENRY B. TOMPKINS, for plaintiffs in error.

CANDLER, THOMSON & CANDLER; HOPKINS & GLENN, for defendants.

JACKSON, Chief Justice.

The defendant corporation being indebted to the Gate City National Bank in a large sum of money, after trying to pay or secure it in various ways, and failing in all, accepted a proposition from Thomson, who was endorser on their notes to the bank (which proposition is reported at the head of this opinion), to shoulder the debt on the terms therein set forth. Whereupon, Thomson took charge of the property under the said agreement, and discharged the debt by an arrangement with the bank, to look to him individually for its payment.

All the stockholders acquiesced except the complainant, who filed her bill to enjoin the consummation of the agreement, on the ground that the contract is *ultra vires*, because Thomson was a stockholder and director at the same time that he was also endorser of the company's paper. It appears that the complainant had not paid up for her

stock, her husband, it is alleged in the bill, being employed by the company to work it out, and pay for it in that way, and being wrongfully discharged. The husband also joins in the bill, and sets up his rights for debts due him by reason of this employment and discharge.

The bill is sworn to by one of the counsel, to the effect that what he knows of his own knowledge is true, and what he has heard he believes, but he does not swear that he knows of his own knowledge a single fact. The chancellor refused the injunction, and complainants excepted.

1. The chancellor was right to deny the application for the writ of injunction, because the facts alleged in the bill were not verified. The counsel does not allege that he knew a single fact set out in the bill, of his own knowledge. A mere affidavit of belief is not sufficient. The case of *Hone & Co. vs. Moody et al.*, 59 *Ga.*, 731, is directly on the point, and rules this case. The answers do not admit the excuses for non-payment of her share by the wife, nor any indebtedness or wrong to the husband. So that the answers do not verify material facts in the bill, and there are no depositions by anybody, and the sole verification is the belief of counsel.

2. Complainants in equity must do equity. They must come in with clean hands. These complainants, according to the sworn answers, are very unclean. They have not paid for the stock, and yet are the only people interested in the company who complain. They must pay up before equity will listen to them—much more before it will enjoin defendants from paying a just debt to an innocent third party, and stop the only way possible to pay it, except under the sheriff's hammer, after expensive litigation and costs, perhaps. Therefore, the chancellor was right to refuse the writ on this ground. All who had paid up their stock were happy that the arrangment was made with Thomson; these, the only shareholders who had not paid for their shares, alone complain. Code, §3084; 60 *Ga.*, 222.

3. These principles are ample to decide the only question before us with the chancellor. He could not grant an injunction on such a verification of the bill, nor could he grant it in aid of a party whose default in paying what he subscribed to the company, as his share in the venture, contributed to make the debt, the provision to pay which necessitated the arrangement with Thomson.

But we think the stockholders empowered the directors to make the arrangement with Thomson, or anybody else; and as all of them, except this defaulter, are satisfied, it would be anything but equity to defeat the wishes of all the others to gratify her. The action of the stockholders, we think, did not confine the directors to one mode of arranging for this debt, but is broad enough to cover that made with Thomson. That action of the stockholders, and the subsequent action of the directors in agreeing to Thomson's proposition, will appear in the report at the head of this opinion.

See Mor. on Corp, 240; 56 How., 70; 1 *Ga.*, 171-2.
Judgment affirmed.