## HILLSIDE COTTON MILLS v. BARTLEY et al.

PER CURIAM. 1. Where a tract of land is subdivided and is subsequently found to contain either more or less than the aggregate amount called for in the surveys of the tracts within it, the proper course is to apportion the excess or deficiency among the several tracts. 9 C. J. 295, § 360, and cases cited.

2. But where there is a shortage in the actual land subdivided and platted into lots and blocks with intervening streets, each block should, if possible, be treated as distinct, and the shortage therein should be distributed among the lot owners, except so far as possession has fixed the limits. Quinnin v. Reimers, 46 Mich. 605 (10 N. W. 35); Anderson v. Wirth, 131 Mich. 183 (91 N. W. 157).

3. There being, in the amendment offered by the defendant to its answer, no allegation that it is not possible to treat separately the block in which the lot in dispute is located, and that there is any shortage in this block, the court did not err in sustaining a demurrer to such amendment, and in omitting to give to the jury instructions on the theory that the defendant was entitled to apportionment on account of shortage not shown to exist in such block.

4. There is no error in any of the other assignments of error.

Judgment affirmed. All the Justices concur, Russell, C. J., specially. ATKINSON, J., concurs in the result.

No. 3458. SEPTEMBER 7, 1923.

Ejectment. Before Judge Roop. Troup superior court. September 26, 1922.

M. U. Mooty and B. J. Mayer, for plaintiff in error.

L. L. Meadors, W. E. Armistead, and A. H. Thompson, contra.

RUSSELL, C. J., concurring. In my opinion the decision in this case must be controlled by the following principles:

1. Apportionment is an equitable remedy which depends upon the principle that he who would have equity must do equity. The defendant's answer to a suit in ejectment denied the plaintiff's right to recover any portion of a city lot of which the defendant was in possession, or any interest of the plaintiff in said lot. An amendment to the answer which asked for an apportionment of an alleged shortage of 93 feet in the total frontage of a series of lots along a given street was properly stricken, since the failure of the defendant to admit in any part of its answer that the plaintiff was the owner of any lot was not in accord with the principle first stated. The amendment was properly stricken upon the general demurrer on the further ground that it plainly appeared from the allegations of the answer and a proposed amendment that the defendant's right to an apportionment, if any ever existed, was lost on account of its own laches.

2.   While a trial judge is required to give in charge to the jury the law affecting every substantial issue in the case as presented by the pleadings, he is not required to instruct the jury as to matters developed alone in the evidence, without an appropriate written request.   The equitable doctrine of apportionment is applicable only in the absence of facts showing that equity does not require the application of a different rule.   Sellers *v.* Reed, 46 Texas, 377.   In view of the fact that the defendant measured its lots from the south instead of from the north (as the land was surveyed and platted), and that the defendant purchased long after the plaintiff, and in view of the further fact that it is not shown that the shortage may not have resulted from the fact that the land owned by the defendant overlapped the survey at the south end, both the laches of the defendant and its occupation of the lot claimed by the plaintiff required, in this case, the application of a different rule than that embodied in the doctrine of apportionment.

The following is a statement of the facts as shown by a complete review of the record.   J. S. Bartley filed, in July, 1918, an ejectment suit in common-law form against the Hillside Cotton Mills, seeking to recover a certain lot in the City of LaGrange. This lot was designated as lot number 50 Elm Rose Avenue, in the Ridley and Wisdom addition to LaGrange, as per plat of R. M. Hall, C. E. "Said property recorded in deed book 9, page 94 & 95, in the office of the clerk of the superior court of Troup County, Georgia."   The defendant answered and set up that the tract of land referred to as the Ridley-Wisdom addition lies north of other land owned by the defendant, and, in view of this, purchasers of other property in the addition began building from the south end of said addition, and from time to time built houses towards the north end.   It is alleged that a large number of lots upon which houses have been built belong to the defendant.   The answer further alleged that when houses had been built nearly to the north end of said addition, it was found that more lots were shown on the plat referred to in the plaintiff's petition than there was land in said tract, so that there were not and could not have been as many lots laid out in this tract as were shown on said plat.   The answer further alleged that most of the lots in said addition were owned by Dr. Morgan, from whom the defendant purchased al-

most all the lots which it bought in said addition; that when it was found by defendant and Dr. Morgan that all the lots shown by the plat could not be laid out in said tract, Dr. Morgan agreed with the defendant that all lots shown at the north end of said addition which Dr. Morgan did not own he would purchase, and that said lots shown on the north end of said plat would be disregarded and the remaining lots would then stand laid out on the tract in accordance with the plat. Dr. Morgan had deeds to the lots shown on the north side of said plat which were in excess of the actual land, and which were eliminated from the plat, with the exception of one lot, the same being shown on the original plat as number 50. The title to this lot was shown by the records of the clerk of the superior court of Troup county to be in Goldstein Brothers, and Dr. Morgan informed the defendant that he had bought the lot held by Goldstein Brothers. Thereupon and in good faith, believing that Dr. Morgan had purchased and held title to all the extra lots shown on the north end of the plat, defendant purchased the lot which plaintiff now claims and built thereon a house at an expenditure of approximately $1500. The answer sets up that *if the plaintiff has any interest* in said addition, the defendant was unaware of it when it bought the land which the plaintiff is now claiming; that defendant had examined the records and found the records to show otherwise before defendant purchased, and defendant bought and built in good faith and without any knowledge of any claim or title by the plaintiff. The answer alleged that if the addition is laid off in accordance with said tract, beginning at the south end, there is no land upon which to plat the part which plaintiff claims. If the land is laid off from the north, there is no land for the lots purchased at the south end and upon which 25 or more houses have been built. To attempt now to divide the land in proportion to the land shown on the plat would cut the land into such sized lots as to cut into the houses now built upon the land, and the houses now built would in various instances stand upon more than one lot. In view of these facts the plaintiff can not, in law and equity, now recover the land he is suing for, or any particular lot in said addition. But if he has any right therein, the court should frame a decree so as to do equity, not only between the plaintiff and defendant, but also between all of the parties who have built houses in said addition.

18

Quoting from the answer, it is averred:

" If the plaintiff has any rights in said addition, in view of all the circumstances, it is merely an equitable interest in the entire tract of land originally platted; and it would be unjust and inequitable for this defendant to bear the entire expense, cost, and loss, but the same should fall proportionately on all the lots in said addition. And if plaintiff has any rights in said addition, in equity the same should be determined, and this defendant respond to plaintiff for its proportionate part only." The prayer was as follows: " This defendant prays the court, in view of all the facts aforesaid, that the court determine what right, if any, plaintiff has in said land and what is equitable and just between plaintiff and defendant and all those interested in the lots in said addition; and enter a decree establishing the rights of all of the parties; and defendant prays that if plaintiff should be found to have any interest in the land sued for by the plaintiff, that the said interest of the plaintiff be valued by the jury, in order that the defendant may pay the value of such interest to the plaintiff, and the title of defendant to said lot be finally fixed and determined; or that the value of the improvements put on the lot by the defendant be valued and defendant be reimbursed by the plaintiff therefor, and title then be decreed in plaintiff to said property; and defendant prays for such other and further relief, both legal and equitable, general and special, as to the court may seem meet and proper."

The plaintiff amended his declaration and added a demise from J. S. Bartley, dated March 24, 1909. In January, 1921, the defendant amended its answer, and, after alleging substantially the facts set forth in its original answer, sought to have certain named parties made codefendants. Further, defendant " avers that the present owners of lots on the street on which the lot claimed by the plaintiff fronts and is alleged to be located are this defendant [naming the owners], all residents of Troup County, Georgia. Any deficiency existing in the land on said street should fall on all the owners on said street equitably; and by reason of the facts stated in this amended answer and this defendant's original answer, the frontage on said street cannot be prorated, because of houses being built thereon prior to the discovery of the said shortage. . . All of the present owners of lots on said street as set out herein are necessary parties to this suit." This amendment was allowed sub-

ject to demurrer; and a rule nisi was issued against those sought by the defendant to be made parties to the suit, requiring " that they further show cause why a decree should not be entered in said cause, placing the burden of said shortage on all the owners on said street, equitably." Those sought to be made parties to the suit answered the rule nisi and filed demurrers. They set up that nothing is shown by the pleadings which would entitle either of the parties to have the respondents made parties to the suit; that the pleadings of both parties show that there is a complete and adequate remedy at law, in that each of the parties claims title under warranty deeds, and can proceed against their grantors for any shortage or deficiency; that they were not original parties and are not necessary or proper parties to the suit. Upon the demurrers the judge " ordered and adjudged that the amendment praying that the above persons be made parties is disallowed, and the application to make them parties in said case is denied." To this order the defendant filed exceptions pendente lite; and the case as originally filed proceeded to trial.

J. S. Bartley, the plaintiff, introduced as a witness, testified that he was the person to whom the deed from Mrs. Leila A. Wisdom and F. M. Ridley Sr. was made. This lot was bought twelve or fourteen years ago, and it is right on the A., B. & A. Railroad at the corner of a piece of woods north of the Hillside Cotton Mills. The lots were staked off the day he bought the lot in dispute, and the stake on the lot he bought had number 50 on it. The witness is not now in possession of the land; the Hillside Cotton Mills is in possession of it. He doesn't remember when they took possession of the lot, some two or three years ago. They went ahead and built a house on this lot. When he heard that they were building on his lot he went out there, and they were putting up the laths for the plastering. He came back to town and saw a lawyer, and the attorney called up Mr. Austin, the agent of the defendant, and he advised that there would be no trouble adjusting the matter. Just a week to the day elapsed between the first visit of witness and the second one, when he found the house completed and some one living in it. Mr. Austin had made no arrangements with witness during that time. Witness has paid the taxes on this land, with the exception of two or three years. He paid one hundred dollars for this lot, and has not deeded it or sold it to any one.

He did not give the Hillside Cotton Mills the right to build on his land. Mr. Lovejoy and several others had been to see witness about buying the lot. Lovejoy came right out on the square by the court-house and told witness that there had been more land sold out there than there was, and he wanted to buy the lot of the witness to keep from having any trouble. Witness told him that his lot was not for sale. Later the Hillside Cotton Mills went ahead and built on the lot.

I. N. Lozier, for the defendant, testified: I am a civil engineer, and was county surveyor for two terms. I have seen the property known as the Ridley-Wisdom addition of LaGrange. I have checked this map contained in deed book 9, pages 94 and 95. I checked it by taking these measurements and laying off these lots on the ground. Starting at the original land line I undertook to lay off these lots north; and I found, coming out over here next to the railroad, there was a number of them short, the land was not there. I believe I was ninety-three feet short. On cross-examination the witness testified: I was working for Dr. W. E. Morgan and making the survey for him. If I had begun my measurements on the north side instead of the south side, the shortage would have fallen upon the other subdivision and not on J. S. Bartley.

Hatton Lovejoy, in behalf of the defendant, testified: I have been attorney for the Hillside Cotton Mills since the organization. I first discovered that there was a shortage in this land a short time before the Mills bought this lot shown by the deed from Dr. and Mrs. Morgan, which is dated September 28, 1917. I was employed by the Hillside Cotton Mills to pass upon the title of all the property they bought. I knew that this shortage was in the property at the time I went to pass on the property. In reference to what I did to eliminate the shortage, some one surveyed the property and reported that there was not enough land there to make all the lots; and the question then was what to do. Dr. Morgan owned a good many lots in the subdivision, about one hundred; and he owned all the lots across along to the A., B. & A. railroad, except one lot, number 50, in the northeast corner. Prior to that time the Hillside Mills had been started, and people had started building from the south end next to the mill and built on up north towards the railroad. Dr. Morgan and I discussed what

to do. We saw that we could not go there and prorate the land, as that would cut people's houses in two. So, in order to simplify it and not let anybody lose any of that subdivision, Dr. Morgan agreed that he owned all the lots to the railroad with the exception of one lot, number 50, and he agreed that he would buy number 50; then he would own all the lots shown on the north side of the plat, and he would discard and eliminate from the plat lots on the north side of the plat, and then leave enough land to give the lots which were left on the plat. Ninety-three feet is all that he had to cut off the plat to leave enough to fit the lots. He said that he was willing to throw the rest of the land in, with the exception of lot number 50, which he said he would buy. We thought that we were buying the lot in the corner next to the railroad. I went to the records of Troup County, and the record showed that Goldstein had lot number 50, and that has since been changed. At the time of looking at the record Goldstein Brothers had a deed on record to lot number 50. Since then it has been changed. Dr. Morgan told me that he had bought lot number 50, and he already had the others, and he agreed that lot number 51 would come up to the railroad; and with that agreement and statement from him I went ahead and approved the title. Afterwards the question came up with Mr. Bartley. Mr. Bartley is mistaken about having a talk with me before this house was built, because my recollection is that the records showed at the time that Goldstein Brothers owned lot number 50. Referring to the deed book which I examined, you can see that the record has been changed since; and here is a memorandum which explains why and when it was changed, with which I had nothing to do. When Mr. Bartley raised the question I went back there, and it had been changed to lot number 52. That is the reason why Dr. Morgan did not get title to lot number 50 and carry out his agreement with me. At the time I accepted this deed from Dr. Morgan to the Mills I had no notice that Mr. Bartley had title to number 50 or 51. I thought Goldstein Brothers owned it. — On cross-examination the witness testified that the deed dated September 28, 1917, is the deed under which the Hillside Cotton Mills claims this property. I didn't know it at the time, but it now develops that I closed the trade with Dr. Morgan before he purchased this property from Goldstein Brothers.

The testimony of Dr. W. E. Morgan, as a witness in behalf of the defendant, was to the effect that the discovery of the shortage in this land was after the date of the deed on September 28, 1917. When witness discovered the shortage, in order to alleviate the condition he got an option on two lots from Goldstein Brothers. Mr. Lovejoy called the attention of witness to the fact that Mr. Goldstein owned lot number 50, or a way that would straighten it out. After witness told Mr. Lovejoy that he could proceed, that witness had the lot, or had it where witness could get it, he then discovered what he did with reference to Goldstein owning the lot number 50. This was after witness had told Mr. Lovejoy. On cross-examination the witness testified that he made the deed to Hillside Cotton Mills, conveying lots number 51, 52, etc., of September 28, 1917. The record in the office of the clerk of the superior court of Troup County was changed on November 16, 1917, so as to show that Goldstein Brothers owned lot number 52 instead of 50. " I owned all the lots with the exception of the lots which I thought Mr. Goldstein owned at the time I made this agreement to sell this property to the Mills, on the north end next to the railroad." The lot witness thought he was buying from Goldstein was a lot next to the railroad. Goldstein made witness a deed to lot number 52 after they found it there, and witness's recollection is that he made witness the deed after witness had sold to the Hillside Cotton Mills.

Plaintiff introduced in evidence the plat of the Ridley-Wisdom Addition to LaGrange, as platted by R. M. Hall, C. E., and recorded in deed book 9, pages 94 and 95, all of said lots being numbered from north to south. Also, deed from F. M. Ridley Sr. and Mrs. Leila A. Wisdom to J. S. Bartley, conveying lot number 50 as per plat of R. M. Hall, C. E., recorded in deed book 9, pages 94 and 95. This deed was dated March 24, 1909, and was filed and recorded March 31, 1909. Defendant introduced deed book 8, page 282, showing record of deed from Mrs. Leila A. Wisdom and F. M. Ridley, to Sam and Morris Goldstein, conveying lot number 52 in the plat referred to. The following, on the margin of the record of this deed, was also introduced: " Note: The number of this lot was changed from 50 to 52 by the original deed, the record was originally in error, showing lot 50 when in fact the lot conveyed was lot 52, as shown by the original deed. This Nov. 16,

1917. G. T. Traylor, C. S. C., by Frank Hutchenson, Deputy."
This deed was dated, filed, and recorded November 11, 1908. The
defendant also introduced in evidence a quitclaim deed from
Leila A. Wisdom to W. E. Morgan, to all the lots described in plat
referred to, dated October 3, 1916, and recorded November 20,
1916. Also, deed from F. M. Ridley to W. E. Morgan and F. M.
Ridley Jr., conveying lot number 51 and ninety-six other lots ac-
cording to plat referred to, the same bearing date of April 8, 1916,
and being recorded April 10, 1916. Also, deed from F. M. Ridley
and F. M. Ridley Jr. to Dr. W. E. Morgan, conveying lot number
51 and other lots according to the plat referred to, dated Septem-
ber 28, 1917, and recorded October 17, 1917.

The jury returned a verdict that the plaintiff recover the prem-
ises in dispute. The defendant made a motion for a new trial,
which was overruled; and to this action of the lower court the de-
fendant excepted and brought the case to this court. In addition
to the usual general grounds of the motion for a new trial, the de-
fendant insisted, in its amendment to the motion, that a new trial
should be granted for the following reasons:

" 1. The brief of the evidence in the case showed that a plat
had been made of a tract of land purporting to divide the tract
of land into various lots. The land involved in this suit lay on
the east side of the plat and of the tract of land at and near the
northern boundary. A street ran north and south along the
eastern boundary. The evidence disclosed that there was not as
much land running north and south, and consequently not as much
frontage on the east side of the land as was shown by the plat, and
that there was not enough land in the actual piece of land pur-
ported to be platted, surveyed from north to south, for the various
lots shown on the plat to be laid off on the ground, or, in other
words, that there was not enough land for all of the lots shown on
the plat. The evidence showed further that building upon the
lots commenced at the south end of the property and continued
toward the north end, and as these buildings were constructed lots
were laid off on the ground of the sizes shown by the plat and
the buildings then constructed on these lots; that thereafter
a shortage in the land was discovered. The evidence further
showed that if the lots shown on the plat were laid off on the
ground, beginning at the south side of the land platted, the land

in dispute would be covered by the deed to the defendant. If the lots were laid off on the land in accordance with the plat, beginning at the north side, the land in dispute would be covered by the plaintiff's deed, and none of the other lots on this street as shown by the plat would correspond with the lots as they had been laid off on the ground, beginning on the south side. If it were attempted to lay off the lots beginning at the north side, then each lot as laid off would miss the land which had been laid off for that lot by ninety-three (93) feet, because the lots had been laid off as building was done from the south side. Not only did the evidence disclose the above facts, but these facts were pleaded by the defendant in its answer, defendant showing that if the land was laid off of the south boundary the property in dispute would be covered by defendant's deed, and that if the lots were laid off from the north side the property in dispute would be covered by plaintiff's deed, and that the building had commenced and progressed on lots laid off from the south side before the shortage was discovered; and that under these circumstances the plaintiff could not recover upon a legal title to the lots as shown by this deed as described on the plat, because of the fact that there was not enough land for all the lots, and further, because, in view of the building which had commenced at the south side and progressed northward, it was impossible now to prorate the shortage without cutting into buildings which had been built prior to the discovery of the shortage. Defendant further pleaded that plaintiff could not recover on his legal title in the case; and that if the plaintiff could recover at all, the court should frame a decree so as to protect the defendant in its rights and then do equity between defendant and all of the others owning property on this street. The above are the contentions of the defendant; and the defendant now assigns error upon the fact that the court gave no instructions whatever to the jury upon the above issues, and did not give the jury any rule whatever to guide them where there was a shortage in the land which had been platted, and the court did not instruct the jury what the jury should do in view of such shortage, and did not instruct the jury what the law was where such a shortage existed in the land so that all the lots shown on the plat could not be laid off, and the court left the jury without any guide or instructions as to law on the issues made by the above evidence and the pleadings.

" 2. Defendant assigns error upon the charge of the court as follows: ' Now, gentlemen, the plaintiff insists in this case that the premises in dispute, the land in dispute, is the land described in the deed to the plaintiff from Mrs. Wisdom and Ridley Sr. The plaintiff insists that the land in dispute is embraced within the description of that deed. The defendant in this case insists that the land in dispute is not embraced in the description in the deed to the plaintiff, but is embraced within the description in the deed to the defendant.' Because this charge was not adjusted to the facts in the case, the evidence showing that the plaintiff had a deed to lot No. 50 and that the defendant had deed to the adjoining lot No. 51, and there was not enough land for the plaintiff or the defendant or the other owners on this street to have the land described in the plat. The charge given merely asked the jury to find which deed covered the land in dispute, when under the evidence there was a shortage so that the plaintiff, the defendant, nor the other owners on this street could have the lots shown on the plat laid out on the actual land. Said charge was not adjusted to the issues in the case, because, under the evidence, it depended on whether the lots were laid off from the north or the south side, whether the land in dispute fell under the plaintiff's deed or the defendant's deed; and the court did not instruct the jury whether the survey should be made from the north side or the south side, or how the survey should be made in view of this shortage, or what rule of law should govern the jury in reaching a verdict in view of this shortage."

The questions raised by the two foregoing assignments of error present the controlling issues in this case. The same questions are involved in the adjudication wherein the trial judge sustained the demurrer to the amendment to the answer of the defendant, asking that owners of lots in the Ridley-Wisdom subdivision other than the plaintiff and defendant be made parties, and, contrary to the contention of the defendant, dismissed these outsiders from the proceedings. To state the contention of the defendant, now plaintiff in error, as it appears in the brief of counsel, the Hillside Cotton Mills pleaded that " There was a shortage in the land, measuring it south and north, of 93 feet; . . the defendant pleaded the above shortage and the insufficiency of the land for each owner to receive a lot of the size shown by the plat; . .

and there being buildings erected upon some of the lots, an attempt to apportion the shortage would result in cutting the improvements in the lots in two and leaving parts of the improvements on different lots all along the street. The defendant prayed for equitable relief so as to do equity and justice between all the parties under the circumstances. The defendant offered an amendment asking that all owners of property upon this street be made parties, and that the relative rights and title of the several owners be fixed by apportionment of the shortage, or by such other rule as would be equitable and just. The court disallowed this amendment and prayer, to which exceptions were preserved and upon which error is now assigned. . . Although the above facts were both pleaded by the defendant and the evidence as to the shortage was undisputed, the court gave no instructions whatever to the jury as to what should be done in view of this shortage, and gave the jury no instructions either to apportion the shortage or to guide the jury in any way whatever in reference to this shortage. . . The court merely charged the jury that if the land in dispute was covered by the defendant's deed the defendant should prevail, and if the land in dispute was covered by the plaintiff's deed he should prevail. . . By the verdict and judgment the defendant's deeds were practically wiped out, and the defendant stands the entire loss of 93 feet."

I see no error in the ruling of the judge upon the demurrer nor in his omission to instruct the jury upon the shortage of 93 feet in the land represented by the plat which appears in the record. There was no reason why certain named individuals who had purchased lots along the line of Elm Rose Avenue should be made parties for the purpose of apportioning a shortage consequent upon the fact that the land included within the dimensions of the plat was short by 93 feet. The action was one of ejectment. The plaintiff was compelled to allege that the defendant was in possession of lot No. 50, and the defendant admitted that such was the case. There might be circumstances under which an apportionment of the shortage could be asked, but certainly under the well-settled rule that he who would have equity must do equity (*Landes v. Globe C. P. Co., 73 Ga.* 176) the defendant in this case was not in a position to invoke the assistance of a court of equity. Before the equitable relief could be invoked, the defendant must have

surrendered the possession of lot No. 50 to Bartley, and he must have been treated as a purchaser of at least a proportionate part of the entire actual frontage before he or any one else could be required to contribute to the loss of the 93 feet. No such proposition as this is stated in any part of the defendant's answer. The amendment to the answer insists that the purchasers of other lots who had deeds to them (and many of whom had improvements on the lots) should be forced to divide their lots by contribution or apportionment, when the only issue in the case as pleaded is as to whether the title of the plaintiff to lot No. 50 (and his right of possession thereto) is superior to that of the defendant. The plaintiff and the defendant both claimed to have bought the land comprised within lot number 50, as claimed by the plaintiff and so described in his deed. The persons whom the defendant sought to have made parties in the suit have no interest in common with either the plaintiff or the defendant. None of the persons sought to be made parties had anything to do with the trade of either the plaintiff or the defendant. There is no common interest nor any joint interest.

It would be more reasonable to hold that if the original vendor had sold the same lot to two different vendees, and there was a shortage, the owners of all adjacent lots should contribute a part of their property to provide lots for each of these vendees. The doctrine of contribution only applies after a co-obligor has parted with his money in discharging a joint obligation. *Hall* v. *Harris*, 6 *Ga. App.* 822 (65 S. E. 1086), and cit.; 13 C. J. 823. To have allowed these persons to be made parties in the case would have created a misjoinder of parties and causes of action. 6 R. C. L. 1036. It is plain that the principle of contribution has no application in this case. The right of apportionment rests upon the same equitable principle as that of contribution; that is, the bearing of a common burden or the proportionate sharing of a loss growing out of an existing situation or relationship between the parties, by which each is in equity and good conscience required to contribute his share of the total loss of land for the benefit of those who, under the peculiar circumstances of the case, should be required to contribute to one who, without fault on his part, would otherwise sustain a loss. This doctrine of apportionment might be well applied, for instance, in a case where all purchasers at a

public sale, buying only by a plat, soon thereafter discover that there was a shortage; and perhaps in other similar instances. But the trial judge in this case correctly ruled that it would be inequitable to hold, where a party purchased, as did the defendant in this case, long after the public sale, with full and ample opportunity of investigating the true dimensions of each lot so purchased and preferred arbitrarily to measure the land from the south towards the north, when the plat itself shows that it was laid off from the north towards the south, and with full knowledge of the shortage, and relying merely upon oral representations of its vendor that the shortage had been obviated, proceeded without process of law to take forcible possession of a lot which another, by a duly recorded deed, was apparently entitled to possess, that the doctrine of apportionment was not only inapplicable but would be extremely inequitable.

Conceding it to be a rule recognized in some jurisdictions of the United States, that, where land is subdivided by a plat and there is a shortage of land, the shortage shall be apportioned between all the lots (9 C. J. 295, § 360; Pereles *v.* Magoon, 78 Wis. 27, 46 N. W. 1047, 23 Am. St. R. 389, and note; Booth *v.* Clark, 59 Wash. 229, 109 Pac. 805), I think the correct qualification which is applicable in this case is that stated by the Supreme Court of Texas in Sellers *v.* Reed, 46 Texas, 377, to the effect that the apportionment will only be made in the absence of facts showing that equity does not require the application of a different rule; and, as stated above, for the reason that equity does in this case require the application of a different rule, the trial judge did not err in omitting to give the jury any instructions whatever on the subject of apportionment. The judge is required to instruct the jury as to each issue raised by the pleadings and supported by the evidence. This is fundamental. But in this case the correct ruling of the learned trial judge upon the demurrers to the amendment of the defendant's answer removed from the cause any issue upon the subject of an apportionment, and any instructions whatever upon that subject would have been error.

It was not error, as complained in the motion for a new trial, to permit the witness to answer the question, "Who has paid the taxes on that property since the date of your deed — since the date you purchased it?" over the objection that the tax return would

be the best evidence of what was included in the returns, and what property the taxes were paid on. While the return would be the best evidence as to the amount of taxes due and *to be paid* by a taxpayer, the payment of all or of any part of the taxes is a substantive fact to which any person making payment may testify.

It is made plain by the verdict of the jury that the ruling of the court excluding certain testimony tending to show that the lot purchased by the plaintiff was of less value than he claimed was not harmful. In an action of ejectment the amount paid for the premises in dispute ordinarily does not affect the right of possession, and the value of the premises may be immaterial.

It is insisted that the verdict is contrary to law and the evidence. As appears from a statement of the evidence, Bartley, the defendant in error, purchased his lot from the original proprietors of the old broom-sage field which was subdivided to be sold. His deed was recorded in 1909. The defendant did not purchase until 1917. The defendant owned the land adjacent to the tract described in the plat and joined it on the south side. It purchased a large number of lots from one Morgan and his wife in 1917, eight years after the purchase of lot number 50 by Bartley. The defendant and its attorney relied solely upon Morgan to extinguish the outstanding title of Goldstein Brothers, who were erroneously supposed to be the owners of lot number 50. Proposals were made to Bartley to buy his lot, but he declined to sell; and the defendant then proceded, in defiance of Bartley's rights, to erect a dwelling-house upon Bartley's lot. I have omitted the statement of additional circumstances which might be related; but it is inconceivable how any verdict other than that rendered could have been returned by an impartial jury, except that there was evidence that might have authorized a finding for mense profits in addition to the finding of the possession of the property.