### GULF OIL CORPORATION et al. v. TIMMS et al.

### No. 3258.

Court of Civil Appeals of Texas. Beaumont.

March 17, 1938.

Rehearing Denied May 18, 1938.

·Pace, Goens & Park and T. N. Jones, all of Tyler, and Robert F. Carter, B. C. Clark, John Broughton, and John E. Green, Jr., all of Houston, for appellants.

Mayfield, Grisham & Grisham, of Tyler, Ocie Speer, of Austin, P. G. McElwee, of Houston, and W. A. Keeling and J. A. Lantz, both of Austin, for appellees.

WALKER, Chief Justice.

In a suit for partition by the heirs of Mrs. M. E. Tucker, the district court of Gregg county entered its judgment in 1910, dividing a tract of 660 acres of land, a part of the Issac Ruddle and W. B. Chism surveys in Rusk and Gregg counties, belonging to her estate into five lots; each lot was specifically described in the decree of partition by its own field notes—lines and corners located by calls for course and distance. Lots 4 and 5, together, constituted a triangle; lot 4 in the south, the base of the triangle, and lot 5, north of lot 4, the apex. By the calls of the decree of partition, Rabbit creek was the W. B. line of the triangle; the S. W. and N. W. corners of lot 4, and the S. W. and N. corners of lot 5 were in Rabbit creek. The S. B. line of the triangle—the S. B. line of lot 4—began at the S. W. corner of lot 4 in Rabbit creek, and ran N. 81 E. 1360 varas to its S. E. corner—the S. E. corner of lot 4—in the W. B. line of lot 2. The E. B. line of the triangle was the W. B. line of lot 2, and on the calls of the decree of partition extended N. 25 W. from the S. E. corner of lot 4—the S. E. corner of triangle—665 varas with the W. B. line of lot 2 for the N. E. corner of lot 4 in the W. B. line of lot 2; and the north end of the E. B. line of the triangle extended S. 25 E from the north corner of lot 5—the W. B. corner of lot 2—750 varas with the W. B. line of lot 2 to the N. E. corner of lot 4. The N. B. line of lot 4 extended S. 81 W. 930 varas to Rabbit creek for the N. W. corner of lot 4; from that corner the W. B. line of lot 4 extended in a southerly direction with Rabbit creek to its S. W. corner, the place of beginning. By the calls of the decree of partition lot 4 contained 142 acres; lot 5, 74 acres.

In 1912, John Douglas and his wife, negroes who could neither read nor write, acquired title to lot 5 by its description given in the decree of partition; at that time a Mr. Laird, a white man, owned lot 4, holding it by its description given in

the decree of partition. The wife of John Douglas died in 1919, leaving as her heirs three daughters born to her and John Douglas. In 1913, in a survey made by Mr. John Choice, a surveyor employed and paid by John Douglas, the N. B. line of lot 4 was located on the ground by the calls of the decree of partition for course and distance from the S. E. corner of lot 4; thus located, this line was established by Choice as a dividing line between lots 4 and 5. By actual survey lot 4, on its description given in the decree of partition, contained only 133 acres, and lot 5, disregarding the call for adjoinder with lot 4 for its S. E. corner, and locating its S. E. corner S. 25 W. 750 varas from its corner—the N. B. corner of lot 2—contained only 45 acres. Choice found an excess of 456 varas in the E. B. line of the triangle, from the S. E. corner of lot 4 to the N. corner of lot 5.

In 1929, John Douglas and his three daughters, joined by their husbands, sold lot 5 by its description given in the decree of partition to Fred Birdsong, J. B. Parker, and Gus Pinkerton, who in 1931 executed on lot 5, by its description given in the decree of partition, an oil and mineral lease to Gulf Production Company; this company developed the land north of the Choice dividing line for oil, and produced from it large quantities of oil.

After the death of John Douglas his three daughters had lots 4 and 5 resurveyed, and on a theory of apportionment prorated the excess in the E. B. line of the triangle—not the excess in its acreage—between lots 4 and 5; on their theory of apportionment they located the N. E. corner of lot 4 in the W. B. line of lot 2, N. 25 W. 268 varas from the Choice location of the N. E. corner, and from that corner ran the N. B. line of lot 4, S. 81 W. to Rabbit creek; the line thus established they claimed as the dividing line between lots 4 and 5. This line added 29.05 acres to lot 4, giving it an acreage of 162.05 acres; it reduced the acreage of lot 5 from 74 acres, as given it by the partition decree, to 69.37 acres.

In 1935, the daughters of John Douglas, appellees herein, instituted this suit in trespass to try title, pleading also the statutes of limitation, against Gulf Oil Corporation, Fred Birdsong, J. B. Parker, Gus Pinkerton, and the owners of lot 4, for the title and possession of the 29.05 acres lying between the N. B. line of lot 4 as

located by Choice and its N. B. line as located by appellees on their theory of apportionment; they also prayed for judgment against Gulf Oil Corporation for the value of the oil produced by it from this land. It was the theory of appellees' petition that the land sued for by them was a part of lot 4, and was not included in their deeds to Birdsong, Parker and Pinkerton, and that they had title to this land by limitation as against the owners of lot 4. The defendants answered by pleas not guilty, limitation, etc. Gulf Oil Corporation also answered by cross-action in the nature of trespass to try title. On conclusion of the evidence all parties filed motions for an instructed verdict; the motion of defendants was denied, the motion of appellees granted. On the verdict rendered under the instructions of the court judgment was entered in favor of appellees for the land in controversy, and against Gulf Oil Corporation for the value of the oil produced by it from the land, not barred by limitation, less certain credits. From that judgment Gulf Oil Corporation, Birdsong, Parker, and Pinkerton duly prosecuted their appeal to the Texarkana Court of Civil Appeals; the case is on our docket by order of transfer by the Supreme Court.

We sustain the contention of appellants that, on the undisputed testimony, the Choice line, as located and established by him in 1913, was made the dividing line between lots 4 and 5 by the parol agreement and acquiescence of John Douglas, owning lot 5, and Mr. Laird, owning lot 4. The facts are as follows: In 1913, John Douglas, owning lot 5, wanted to fence it, but neither he nor Mr. Laird knew the location on the ground of the dividing line. Douglas employed and paid Mr. Choice to locate this line. Choice went upon the ground, and with the assistance and aid of Douglas and Laird, both of them being present and participating in his work, surveyed lots 4 and 5. He found nothing on the ground to mark the N. E. and N. W. corners of lot 4, nor the S. E. and S. W. corners of lot 5, nor the N. B. line of lot 4 nor the S. B. line of lot 5, as called for in the partition decree. In making his survey he found the excess in the E. B. line of the triangle made by lots 4 and 5, and the excess in the acreage of the triangle, above the calls for acreage given to lots 4 and 5 in the decree of partition.

All parties were fully advised of the result of his work; there was no concealment by Choice, nor mistake, nor fraud, nor accident. He was employed to make this survey—the very purpose of his survey was to locate the dividing line between lots 4 and 5. With all the facts before him, with the owners of lots 4 and 5 participating in the survey, he located the N. B. line of lot 4 on its calls as given in the partition decree, and pointed out to the parties that line as their true dividing line. Both parties accepted this designation as their true dividing line, and the owners of lot 4 have never attempted to withdraw from the agreement as made by Mr. Laird. Immediately after the survey Douglas, claiming the Choice line as his S. B. line, fenced lot 5 down to that line, claiming it as a part of lot 5, and cleared, cultivated, used, and enjoyed the land north of the dividing line—the land in controversy in this suit—for thirteen years, until he and his three daughters sold lot 5 to Birdsong, Parker and Pinkerton; in making that sale Douglas went upon the ground and pointed out to Birdsong, Parker and Pinkerton the Choice line as his S. B. line, and represented to them that the land north of this line was a part of lot 5, and was included in the deeds he and his daughters were executing to them.

The facts of this case, under well-recognized principles of boundary law, fixed and established the Choice line as the dividing line between lots 4 and 5. In 7 Tex.Jur. 194, § 54, it is said: "A disputed boundary line may be fixed by a parol agreement between adjoining land owners, which, when fairly and honestly made, will be recognized as binding upon them and those claiming under them, even though a mistake was made and the true line was not ascertained. Such agreements, when fairly made, are favored by law; they are approved and encouraged by the courts on the ground of convenience, policy, necessity and justice, and as being in the interest of peace and tranquility. *Accordingly, where the location of a line has not been established or is otherwise doubtful and uncertain, and the contiguous land owners orally agree to a survey and to be bound by the result, they are concluded by the line run.*" (Italics ours.)

In Hay v. Briley, Tex.Civ.App. 43 S.W. 2d 301, the court said (page 304): "When there is a doubt or uncertainty, or a dispute has arisen as to the true location of a boundary line, the adjoining owners may by parol agreement establish a division line; and, where the agreement is executed and actual possession is taken under such agreement, it is conclusive against the owners and those claiming under them."

In Grawunder v. Gotoskey, 204 S.W. 705, the Galveston Court of Civil Appeals said (page 707): "It seems to us that every essential of a valid parol agreement establishing a boundary line is shown by the undisputed evidence. The line had never been marked and fixed on the ground by a surveyor. There was nothing in the deed by which its location could be fixed other than the calls for course and distance. In this situation the parties, being desirous of fencing their lands, employed a surveyor to locate the line for them, and, having no reason to doubt that the line as fixed by the surveyor was the true line, accepted it as such, and erected their fences in accordance therewith. To hold that, after more than 25 years' recognition by the owners of the land of this agreed line as the true line, a remote vendee of one of the owners who agreed to the line as originally surveyed and established can, upon discovering from a resurvey that the first survey was inaccurate, change the line as originally established would destroy the doctrine that a boundary line can be fixed by parol agreement. There is no rule of decision more firmly established than that a parol agreement fixing a boundary line will not be set aside merely because it is subsequently discovered that the agreed line is not the true line. Cooper v. Austin, 58 Tex. [494], 501; Lecomte v. Toudouze, 82 Tex. [208], 214, 17 S.W. 1047, 27 Am.St.Rep. 870; Coleman v. Smith, 55 Tex. [254], 259."

Appellees' theory of apportionment has no application to the facts of this case. The rule of apportionment is stated as follows by 9 C. J. 295: "Where a tract of land is subdivided and is subsequently found to contain either more or less than the aggregate amount called for in the surveys of the tracts within it, the proper course is to apportion the excess or deficiency among the several tracts."

On facts invoking the rule of apportionment, in Johnson v. Knippa, Tex.Civ. App., 127 S.W. 905, the court said (page 906): "Then as a matter of law the excess should be prorated between the

said several surveys according to their respective widths as called for in the original field notes."

But appellees do not seek to apportion the excess acreage in the triangle, but to apportion the excess in the E. B. line of the triangle, thereby increasing the call for acreage of lot 4 by 29.05 acres, and reducing the call for acreage of lot 5 to 69.37 acres. Again, the rule of apportionment is a rule of equity, and cannot be applied where the result would be inequitable. Sellers v. Reed, 46 Tex. 377; note, 97 A.L.R. 1227. The rule is applied only as a last resort, and has no application where the dividing line has been established by the possession, acquiescence, and agreement of the parties. Hillside Cotton Mills v. Bartley, 156 Ga. 271, 119 S.E. 404; Anderson v. Wirth, 131 Mich. 183, 91 N.W. 157; Quinnin v. Reimers, 46 Mich. 605, 10 N.W. 35; Mason v. Braught, 33 S.D. 559, 146 N.W. 687. Appellees do not seek to right a wrong done them in 1913 by the Choice location of the dividing line, for by that location they were given all the excess acreage in the triangle; but they would take from their grantees land pointed out by them as being a part of lot 5, based upon the Choice survey. This suit was not prompted by a pricking conscience to right a wrong done by John Douglas to Mr. Laird in 1913—those holding under Mr. Laird were satisfied with the Choice location; but, having taken the land from their grantees on a construction of the field notes in their deeds to their grantees, they would then take the land in controversy by limitation from the owners of lot 4, after giving it back to them by their theory of apportionment. The remedies of equity cannot be invoked to accomplish these harsh results.

It follows that the judgment of the lower court in favor of appellees must be reversed, and judgment here rendered for appellants that they go hence without day and recover of appellees their costs, and that Gulf Oil Corporation have judgment against appellees for title and possession of all interests held by it under its lease from Birdsong, Parker and Pinkerton.

Reversed and rendered.